## Ex Parte Stephen A. McKinney.

Habeas Corpus. — Following the rule heretofore laid down in applications for *habeas corpus*, this court refrains from comment on the testimony upon which bail was refused below, and simply affirms the order of the court in the present case.

Appeal from the District Court of Travis. Tried below before the Hon. E. B. Turner.

The charge was the murder of Gus Porter, on November 15, 1878, and the appeal is from the refusal of the court below to admit the appellant to bail.

It appears from the evidence that, some nights before the killing, the deceased had an altercation, in an alley in the rear of the house of deceased's mother, with a party having no connection with this case, at which appellant and one Bailey, jointly indicted with this defendant, were present, and siding evidently against the deceased. The mother of deceased appeared on the scene, and induced the boys engaged in the controversy to "make friends." Subsequently, deceased received a postal-card through the post-office, signed with the initials of Bailey, in which very severe epithets were used.

This testimony shows that on the evening of the killing, before dark, the two implicated boys hired horses at a livery-stable, stating that, if used for a longer time than hired for, the extra pay would be forthcoming. Other testimony shows that the appellant and Bailey inquired for deceased at a bar-room and at a house of prostitution, before the killing, and that Bailey, after procuring arms from deceased at one of the houses, remarked to some of the inmates that he would return and treat them later in the night, if he was not killed, or did not kill some one himself and have to jump the town. To one he spoke of his intention to whip deceased, and answered " No " to the inquiry, " Can't you whip him fair? " It is further shown that appellant and Bailey were twice at the house of Franklin, before the killing, and Bailey was heard to say, " If there are officers here, we won't do anything, but will kill deceased before morning."

Deceased, it appears, starting up town with some of his companions, heard or saw appellant and Bailey coming out of the house last spoken of, and directed his friends to await him a few steps up the alley, as he wanted to see Bailey about calling him a s—n of a b—h. It is stated also that about this time, or a little before seeing the parties, deceased went into the house, and returning shortly, told his associates that they (meaning appellant and Bailey) were fixed for him, and he would see them and settle it. Deceased then, it is testified, stepped five or six feet into the alley through which the appellant and Bailey were approaching their horses, tethered near by, and called to Bailey, and asked, " Bailey, did you call me a s—n of a b—h?" Appellant then, it is testified, ordered deceased to throw up his hands, and deceased threw up one hand, and said, " Hold on, I have no fuss with you ;" whereupon appellant answered, " Hold up both hands, or, G—d d—n you, I will kill you," and immediately fired ; and deceased fell to his knees and

commenced firing, Bailey exclaiming, "Don't shoot me; I have done you no harm." Bailey mounted his horse, and several shots were fired by the parties.

The witnesses generally could not tell which hand was held up by the deceased, — the right hand it is confidently asserted by some, the left by others; but this testimony as to which hand is generally impression.

There is some apparent conflict in other parts of the testimony. The first declaration of the deceased, after the shooting, was made in the presence of several. According to one witness, it was to the effect that on his way up town, with others, he met the appellant and Bailey, when appellant ordered him to throw up his hands, etc.; but that deceased did not say or indicate which hand he threw up. Another witness who was present says that he did say then, and to witness several times subsequently, that he threw up his *right* hand.

Again, it is testified by one witness that when the shooting commenced another witness said, "They are after Gussie;" which was discredited by the witness swearing, until the other witness persisted in this, asserting that she believed it because "they" had been "following Gussie for two or three days." This other witness said that she told her that she believed it because of what she had heard appellant say, — "that if the officers were about, they would do nothing then, but would kill deceased before morning."

The testimony of various witnesses is introduced to prove that deceased was not in the habit of carrying arms, and was never known to have carried arms before that night. None of the witnesses know when or where he armed himself that night. Testimony is also offered to prove the declaration of appellant, on a night previous to the killing, that he always went armed.

This is about the substance of the testimony gleaned from a great number of witnesses. It should be added that,

according to the evidence of one witness, Bailey's expression, "Don't shoot me," etc., was made just before McKinney fired the first shot, and not at a subsequent stage of the *rencontre*, as stated by other witnesses. It was also in proof that the appellant, after absenting himself for a time, returned and surrendered himself voluntarily; and that he was eighteen years of age in June, 1878. The deceased was twenty years old, and it may be inferred that Gentry Bailey and the eye-witnesses of the *rencontre* were also youths.

Space is given for a large part of the lucid and forcible argument filed for the appellant, not only in consideration of its intrinsic merits, but because of the light which, in connection with the evidence, it reflects upon the practice in appeals of the present character.

*Walton, Green & Hill*, for the appellant. McKinney, the applicant for bail, was and is charged by indictment with the murder of Gus Porter, on November 15, 1878. The indictment is joint against McKinney and one Gentry Bailey, but only the first is under arrest, and alone applies for bail.

On the hearing, the judge refused bail, remanding applicant to jail.

It will be observed that, in order to obtain the semblance of express malice, a drag-net was thrown out and the purlieus of the city raked to get what might be loose and boyish expressions, dropped at random, purposeless, and without direct or practical effect, and devoid at the same time of any intent to presently do an unlawful thing, much less to take human life, either of a particular person, or, indeed, of any person.

It will be further observed, by a candid perusal of all the evidence, that the *rencontre* was evidently not only accidental, but wholly unexpected to the appellant, and that

the killing ensued from the then present exigencies, and not in pursuance of a plan, or threats, antecedent malice, former grudges, or, indeed, from any other cause than those which arose on the instant.

Many of the witnesses contradicted one another in such material matters that the discrepancies or contradictions cannot be credited to the usual differences that occur where truthful witnesses give an account of a transaction seen from different stand-points, and with different opportunities to observe.    Here the differences originate, very evidently, not from differences in sight, hearing, or opportunities, but are the emanations of the heart.    Those who desired to see and hear most that would bear the appellant down, saw and heard most, — not that it occurred, but because they desired it should occur.    They could not make their testimony flagrantly false, because detection would ensue ; but they play the role of slanderers, who whisper in the dark of the evening ; they give a sign, but in such a way as to enable them to deny the meaning that may be attached to it. Pimps, companions of dissolute women, ignorant negroes who receive their employment at and about bawdy-houses, unite to crush a citizen.    Their tales, though broken and weakly told, are yet earnests of their faith to the compact ; and while their testimony is incredible, yet to dismember it requires the application, not only of good common sense, but also of a will and nerve to apply it.

We will point out some of the discrepancies, nay, contradictions, which exist in the testimony of those who had equal opportunities to see, hear, and observe.

1. Dr. Cummings says he heard the dying statement of Porter; that Porter did not say in words, nor indicate by signs, which hand he threw up when McKinney demanded that motion.

2. Mrs. Porter, the mother, says Porter told the same tale about the shooting, all the time, — the same he first told

to Dr. Cummings; that he threw up his *right* hand, — that she knew he said he threw up his right hand.

3. Miss Franklin said, as they (McKinney and Bailey) passed her door, Mrs. Porter was sitting with her. She heard one of these boys say: " *If there were any officers there, they would not do nothing, but they would find Gus. Porter before morning and kill him.*" Further on, she says: " When I heard the shot, I was frightened, and said to Miss Mollie (Mrs. Porter, mother of deceased), ' They are after Gussie.' \* \* \* I then told her what I heard Bailey and McKinney say a short time before."

Mrs. Porter, giving an account of the same conversation between her and Miss Franklin, says: " I heard the shooting; at the sound of the first shot, Katie said to me, ' They are after Gussie.' I said ' No, I told him to go to bed;' but she persisted in saying ' They are after Gussie,' and I asked her why she said so, and she replied, '*Because Bailey and McKinney have been following him about for two or three days.*' "

Again, the contradiction is about as radical between. Sophia Davis and Lucy Patterson. Davis says: " Bailey said \* \* \* he was going to whip Gus Porter. I asked him if he could not whip him fair. \* \* \* Said. he was going to fix Gus Porter."

Miss Patterson, giving an account of what occurred at. the same time, is positive that no such conversation took place, and that Sophia Davis was not in the room at all.

The testimony of two other witnesses was taken to shadow threats, viz., John Robinson and Joseph Davis. The first of these fails to cast the wanted shadow; while the other discredits himself, and gives only a conditional threat.

We think we may safely say that this court will determine the degree of guilt of appellant by the facts and circumstances surrounding the shooting, freed from any constructive malice attempted to be foisted into this case.

through threats or antecedent grudges. The truth is, as taught by the facts, that there was no difference, malignant nor of other character, between appellant and deceased. The only anger ever shown between them was in the rear of the house, a few nights before the shooting, and this cause of difference was pacified and the boys made friends. After that pacification, there does not appear to have been any hard feeling manifested towards the deceased by McKinney; indeed, there did not appear to be any cause for hard feeling, malice, or grudge between them. So, we repeat, we think we may rest this case on the facts, the *res gestæ* of the shooting; but if such be not the case, and the court shall consider that the testimony establishes threats, and that such threats constitute, or tend to constitute, express malice in the mind of appellant towards the deceased, then we say that the law is, that if the killing take place under the influence of causes arising at the time the wound is given, the killing will be taken as the result of the causes arising at that time. Perhaps we should state this proposition more accurately, as laid down by authority: "That if fresh provocation intervene between preconceived malice and death, it will not be presumed that the killing was upon the antecedent malice." *McCoy* v. *The State*, 25 Texas, 43.

I. 1. The present Constitution of the State contains a material modification from that of 1845, on the subject of bail. The modification is a step of progress in behalf of human liberty. Const. 1845 (Pasc. Dig. 48), art. 1, sec. 8; Const. 1876, art. 1, sec. 11.

The modification consists in the latter Constitution leaving out the words, " *or presumption great.*" Our present Constitution is in these terms : " All persons shall be bailable by sufficient security, unless for capital offences when the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon

examination of the evidence in such manner as prescribed by law.''

2. Murder, to be murder with express malice, must be killing resultant from the formed design of a sedate and deliberate mind to kill the deceased, or to inflict on him by an unlawful act some serious bodily harm, which might probably end in depriving him of life. *McCoy* v. *The State*, 25 Texas, 33 ; *Farrer* v. *The State*, 43 Texas, 271 ; *Ake* v. *The State*, 30 Texas, 466 ; *Cooper* v. *The State*, 31 Texas, 185 ; *Primus* v. *The State*, 2 Texas Ct. App. 369 ; *Murray* v. *The State*, 1 Texas Ct. App. 417.

3. Where fresh provocation intervenes between preconceived malice and the death, it will not be presumed that the killing was on the antecedent malice. *Murray* v. *The State*, 1 Texas Ct. App. 417 ; 2 Stark. on Ev. 712 ; *The Commonwealth* v. *Jones*, 1 Leigh, 712 ; *McCoy* v. *The State*, 25 Texas, 43. But such killing may be proved to have been actuated by the preconceived malice. Same authorities.

4. The reasonable doubt is applicable, and must be weighed in determining between murder of the first and second degree. *Murray* v. *The State*, 1 Texas Ct. App. 424 ; *Guagando* v. *The State*, 41 Texas, 634.

The distinction between murder in the second degree and manslaughter, where the killing takes place in a conflict between the parties, is : the killing in the one case is from passion arising from an inadequate cause ; while in the other, the passion arises from a cause which is adequate. 1 Pasc. Dig., arts. 2250–2260.

No killing which results from a sudden passion, whether the passion arise from an adequate or inadequate cause, or from a reasonable apprehension of danger to the life or person, or to protect property about to be stolen, or to prevent the killing of another unlawfully, can be murder in the first degree. The element of express malice in such

case is wanting. *McCoy* v. *The State*, *Murray* v. *The State*, and *Primus* v. *The State*, cited *supra*.

We deem ourselves wholly within the line of decisions expounding the law of the State when we say the foregoing propositions are no longer open questions. The principles which distinguish between the degrees of culpable homicide are fixed, the only difficulty being to apply the law to the facts which surround the act of killing.

II. 1. Before a party can be held, on an examination for bail, the several elements of murder with express malice must be evident from the proof: first, sedate mind ; second, formed design ; third, intent to kill.

2. Where there is (1) fresh provocation ; or (2) doubt on either of the three elements of express malice ; or (3) where there is a reasonable apprehension of danger to the life or person, or to property, or to human life ; or (4) doubt as to whether the killing is murder of the first or second degree, — then, on trial before a jury, a verdict of murder in the second degree would be sustained, while one for murder in the first degree would be set aside ; and on trial for bail, bail will be allowed, because the only verdict that would be upheld would be for an offence bailable under the law. Const. 1876 ; *McCoy* v. *The State*, *Primus* v. *The State*, *Farrer* v. *The State*, *Murray* v. *The State*, *Cooper* v. *The State*, *Ake* v. *The State*, cited *supra*.

3. The law of presumption, so far as the question in this case is concerned, has been done away with, — we mean the question of the right of the citizen to bail. Const. 1876, cited *supra*.

III. The expression of the law as made by Justice Roberts (*McCoy* v. *The State*, *supra*) was while the Constitution of 1845 was in force, and when if the proof was not evident, but the presumption great that the defendant was guilty of a capital offence, bail could legally be refused. Not so

now, however; the proof of guilt of a capital offence must be evident, or else the right to bail cannot be legally disallowed. We do not know that the language of the court in the McCoy case would have been different to what it was, had our present Constitution been then in force; but, had there been a difference, it would have necessarily been more liberal to the appellant. But no matter for that; our position is that under the construction of the Constitution and law as they existed in 1860, — severer then than now on the applicant for bail, — the appellant here would be entitled to bail.

IV. 1. What was the object of the framers of the Constitution in pretermitting the words " or presumption great," retaining only " where proof is evident?" Certainly there was an object, and equally certain there was a practical purpose in view. Our reading of the Constitution — the section cited — teaches us that the object and purpose were to confine non-bailable cases to a narrower limit than the bounds thereof under the prior Constitution of 1845; in other words, it was the purpose to require a higher order of proof than aforetime, to deprive a citizen absolutely of his liberty. Human liberty seems to have been regarded by the late Convention as of higher value than did those who framed the Constitution of 1845.

2. When words are used, either in statute or organic law, they are, *prima facie*, used in their ordinary signification. If a technical word, then it shall be construed as a technical word; but if a common every-day word, then its meaning is as the word is commonly understood. The word "evident," as used in the Constitution (art. 1, sec. 11), has a higher, a more positive, or a more definite meaning than "*presumption great;*" indeed, it is a word of power and definite meaning, conveying to the mind a fixed idea, that is almost tangible.

The word "evident" is a common word, — a word of the

people, — and is used understandingly in the most familiar conversation; it means, " clear to the vision, especially to the understanding, and satisfactory to the judgment, * * * manifest, plain, clear, obvious, apparent, notorious." Webster's Unabridged Dictionary, 471.

It would be strange that so plain a word, with so plain a meaning, could be misunderstood, or that there should be serious difficulty in applying it to any state of facts which may exist in connection with a principal fact.

Where there can be serious debate in the mind whether surrounding facts and circumstances plainly and satisfactorily prove the main fact charged, as in this case, — a killing with express malice, — then such main fact is not evident from the proof, as demanded by the law. The proof may be of the dignity of " presumption great," but certainly does not come within any definition of " evident." Not only is this so, but where debate can be maintained in the mind, on the one side and the other, as in this case, as to the presence of express malice, then the reasonable doubt necessarily exists, and the party cannot be held as for murder of the first degree.

We desire to call the attention of the court, with special particularity, to the facts in evidence, and to which we apply the foregoing principles of law.

We deem it evident that the killing was independent of any antecedent malice, whether in the shape of former grudges or as evidenced by threats. There is no evidence of former grudges. The testimony relative to threats is of a threefold worthless character : first, contradictions ; second, unreliable witnesses ; third, not practical, burdened with a present intent to execute ; — and they were foreign to the facts and circumstances surrounding the killing.

We claim that the evidence teaches that the killing took place under one or the other of the following emotions :

1. Actual fear of life, limb, or great personal harm.

2. In the actual protection of property about to be stolen.

3. To save human life in danger of being taken ; or,

4. A reasonable apprehension that the one or the other would be the case.

All the evidence comes from the State, save only as to appellant's surrender, and his ability to give bond, together with his age.

All the parties, actors and witnesses, who knew of the facts attending the killing, were and are boys from seventeen to twenty years of age,— an age when life is exuberant, words free, and actions not well or critically considered ; indeed, when action is an impulse, not impelled by intent, nor restrained by ultimate consequences.

The dying declarations of the deceased were without force, because they were, in soul, proven to be false,—a hard word, but nevertheless true. His account given to his mother, of where he was going when he met appellant and Bailey, was false. This is beyond dispute, according to the evidence. The evidence of Grant, disputing the dying declarations of deceased, is supported by that of Muir and that of Campbell, as also by that of Randolph.

But we wish to call the careful consideration of the court to the facts as given by witnesses who were sworn, and who in person were liable to punishment if they swore falsely.

We take that of Grant, the first witness, who saw the shooting. He says :

" We knocked about town until about eleven o'clock ; came back by Katie Franklin's, and when about the gate, one of the boys said, ' Yonder is Bailey now.' Gus Porter (deceased) left us, went into the house, remained a few minutes, came out, and we all passed on toward the hobbyhorses ; saw they were closed, when Porter said, '*Let's go up town.*' We started ; *. * * got to the alley in the rear

of Katie Franklin's, when we saw, or heard, Bailey and McKinney coming out of the back gate of Katie Franklin's, in the alley. Two horses were hitched near the west end of the alley. The back gate was between twenty-five and thirty yards east of the horses. When we saw them, Gus Porter said, ' Hold on, boys, I want to see Gent Bailey about calling me a s——n of a b——h.' We crossed the mouth of the alley, and stopped near the north-west corner. * * * Porter *went into the alley to where the horses were, and remained there* until Bailey and McKinney were within fifteen feet of the horses, *when he stepped out* into the middle of the alley, at the * * * tail of the horses, and said, ' Bailey, did you call me a s——n of a b——h?' Just at this moment McKinney said, ' Throw up your hands.' Porter threw up one hand, which one I could not tell, and said, '.Hold on, I don't want any fuss with you ;' * * * when McKinney said, ' Throw up your other hand, or I will kill you, G——d d——n you,' and fired. Before McKinney shot, and just when he said, ' Throw up your hand,' etc., Bailey said, ' Don't shoot me, Gus, I have done nothing to you.' Bailey was getting on his horse. As he made this remark, McKinney fired.''

The boy's evidence foreshadows the whole case of the State ; and on it bail is allowable, because the three defences we set up are reasonable, under the facts, in a case of this character, — that is, their falsity is not evident. But the case of the State is greatly weakened by other witnesses introduced by the State. The boy Muir says, '' McKinney told Porter to throw up his hands, three times ; * * * that he is satisfied, though not absolutely certain, that Porter threw up *his left hand.*''

Again, the witness Campbell says : '' When the remark was made, ' Yonder is Bailey,' Porter left them, saying, ' I'll go and see him ; ' * * * went into the gate ; * * * when he returned he was wearing a pistol ;

\* \* \* had not observed it [the pistol] during the sev-
eral hours they had all been up town,'' etc.

But yet further, the witness Randolph, who seems to be
the honest man of all who saw and testified, says : '' I
jumped on Grant's back when about reaching the gate [that
of Katie Franklin's or Mollie Seymour's], which enabled
me to see over the fence into the hall of Mollie Seymour's
house, and I saw Bailey standing in the hall ; I remarked,
' Yonder is Bailey now.' I did this because Porter said he
wanted to see Bailey about that postal-card. Porter said,
' I will go and see him, and overtake you in a minute.'
Porter \* \* \* returned \* \* \* and said, ' They are
fixed for me ; their horses are in the alley ; I will go around
there and settle the matter.' We all then went to the mouth
of the alley, and Porter said, ' You boys go up the fence a
little way, and wait for me.' \* \* \* Porter stepped a
couple or three feet into the alley, and *waited* there about
half a minute, \* \* \* when Bailey and McKinney *came
out* into the alley the *back way*, \* \* \* some thirty
yards from their horses ; came up the alley talking ; and
when in about ten feet of their horses, Porter was at the
rear of their horses, when McKinney said, ' Who is that ? '
There was no reply. Then McKinney said, ' Throw up
your hands !' Porter threw up one hand. McKinney said,
' Throw up your other hand !' Porter said, ' Hold on ! '
McKinney said, ' Throw up your other hand, or, G—d
d—n you, I'll kill you !' and fired.''

The foregoing, with the following, constitutes the mate-
rial evidence which surrounds the killing.

1. A. L. Miller says : '' Never knew him (Porter) to have
a pistol before.''

2. Mrs. Porter (the mother) says : '' They (Bailey and
McKinney) went out at the back door. Gus Porter had
previously gone out at the front door, saying to me he was
going to bed. \* \* \* His room was in a south-easterly

direction from house of Katie Franklin, in the rear of whose house the shooting occurred, and about two hundred yards away.   Where he was shot was in a north-westerly direction from the house of Katie Franklin.    *    *    *    He never wore arms ; he owned no pistol.    Don't know where he got the pistol he had on that night.    I know he did not own a pistol."

3.  Bob Grant says :  " Knew Porter well, as also McKinney and Bailey ; was intimate with them ; never knew Porter to wear arms ; did not know he had a pistol that night ; don't know when nor where he got it."

4.  Campbell, Muir, and Randolph all support the statement of Grant in that they never knew Porter to wear arms, save that Campbell saw him with one when he came out of the house just before the shooting.

Thus, we believe, ends the evidence, so far as it is material in indicating the true facts of the case ; and now :

We submit that, taking the whole of the testimony of the State, without comment, contradiction, or explanation, by and through which express malice is sought to be raised, there is not an imperfect skeleton of express malice, at best ; and when confronted by the facts drawn out on the cross-examination of State's witnesses, the skeleton is shaken to pieces and its marrowless bones consigned to corruption, in which we have serious fears to believe much of the testimony of the State's witnesses has been engendered.

Taking the facts of the case, and measuring the guilt of appellant by the law applicable to the facts, we fail to see evident proof of a killing with express malice, and we look alone through the light of the law as furnished by adjudicated cases recognized by this court as embodying the principles of sound reason and good law.

But admitting, for the sake of the argument, that by the supposed threats — brought to view by doubtful testimony at

best, much of which has met with contradiction, both by living witnesses and connecting circumstances, and the rest repeated from casual conversations, perhaps but half understood and imperfectly reported — the State has raised a great presumption of express malice ; that will not be enough to hold appellant and refuse bail. Const., art. 1, sec. 11.

The proof of express malice must be evident ; not only so, but where such malice is to be inferred from threats, the threats themselves must be positive in character, unconditional, pregnant with intent to carry them into execution, and the utterance of a sedate and deliberate mind, — such threats as would subject the party making them to indictment and conviction under the statute. 1 Pasc. Dig., arts. 2454–2456 ; 2 Pasc. Dig., arts. 6585–6588.

We further submit that it is evident, that it must be evident, to any candid mind impartially surveying the facts which surround the killing, — the actual surroundings, the hour of the night, the manner of the meeting, the words that were said — that the killing ensued from the occurrences then taking place, and that said occurrences reasonably had the effect to impress the mind of McKinney with the belief of the existence of one of these three facts :

1. That a man was there to do him hurt, to life or person ; or, —

2. That he was there in the act of stealing ; or, —

3. That he intended to do some hurt to the life or person of his companion.

If the fatal shot was fired under the belief of the existence of either of the above facts, then the killing could not be murder of the first degree, but must necessarily come below that degree ; the descent depending on the reality of the danger, and the actual emergency calling on him to act.

That Porter had some hostile purpose in view — not, perhaps, extending to an intent to take life, but certainly hostile — seems to be beyond doubt. The opportunity had

just passed for him to see Bailey in the house, and in the light, where differences between them might have been settled; but no, he preferred to ascertain where the horses were, which he certainly did when he went into the house, there being no other opportunity for him to do so, and then arm himself with a pistol and waylay the horses, to which he well knew the man Bailey would soon come.   These acts, accompanied with the expression that he would then and there (at the horses) settle the matter, produces a conviction on the mind that he was hostile; no calm mind can escape the conviction.   *Settle the matter.*   How?   Amicably?   Why not have done so in the house?   Did not Porter go to and remain with the horses for some unlawful purpose?   If not, why did he select so fit a place, and prepare himself so well for such an act?   If his intent was to do an unlawful thing, no matter the degree, who shall measure the extent to which he had determined to go?   Why the cry of Bailey, "Don't shoot me," before McKinney shot?   Why did he thus cry out?   Was it because Porter had drawn his pistol, or made other demonstrations evidencing an intent to shoot?   Why the cry?   If there was cause for the cry, then was the time for McKinney to act.   It was the life of Bailey or of Porter; and that, too, when Porter was lying in wait, having all the advantages.

Again, why not an honest reply when the hail, "Who is that?" was made by McKinney?   Why silence at such a time and under such circumstances?   Was not the silence calculated to arouse suspicion, doubt, and fear?   "Put yourselves in his place;" the country full of assassins and thieves. What would you have done?   What would your care of self have demanded of you to do?

And again, why did Porter throw up but one hand?   No one pretends that he threw up both.   Why only one, right or left?   What was he then doing with the other?   Muir says the left hand was raised, the right down.   In what was

that right hand engaged? If there was reason to throw up one, why not both? The movement of that other hand — his tongue silent, but hand active — was evidently what called out the cry from Bailey, "Don't shoot me."

After all the case has been gone through with, the question returns, Is appellant entitled to bail? And this question must be answered by replying to others, either one of which being answered in his favor, bail follows.

1. Was express malice present?

2. Is it evident express malice was present?

3. Is there a reasonable doubt as to whether express malice was present?

4. Was there fresh provocation, and did it move to the homicide?

5. There being fresh provocation proven, and the law prohibiting the presumption that the antecedent malice (conceding there was such malice) actuated the killing, *is it not clear that it is not proven that such antecedent malice caused the killing?*

6. Is there a reasonable doubt as to whether antecedent malice is proven; and if not, is there reasonable doubt that it, and not the fresh provocation, actuated the killing?

7. Is there reasonable doubt as to whether there was fresh provocation, and that it, and not antecedent malice, caused the killing?

8. Was deceased there with hostile intent?

9. Did deceased make any hostile demonstration?

10. Did deceased make demonstration as if to draw a weapon? Did Bailey think so, and cry out?

11. Did appellant believe, or have reason to believe, deceased was about to draw a weapon and use it?

12. Is there reasonable doubt on this proposition?

13. Did McKinney believe, or have reason to believe, that the man (deceased) was there to do harm to him, his companion, or property?

14. Is there actual doubt of the above proposition?

We are under thorough conviction, from the law and the evidence, that the killing in this case was not with express malice ; that it cannot be lifted, by any means, to that high degree of crime.

*Sheeks & Sneed,* of counsel for the State, submitted a cogent review of the evidence to demonstrate express malice.

*Thomas Ball,* Assistant Attorney-General, for the State, maintained that in no view of the case was the appellant entitled to the privilege of bail, citing *Jordan* v. *The State,* 10 Texas, 479 ; *Gherke* v. *The State,* 13 Texas, 574 ; *Atkinson* v. *The State,* 20 Texas, 531 ; *Murray* v. *The State,* 25 Texas, 52 ; *Sharp* v. *The State,* 1 Texas Ct. App. 300 ; *Dubbe* v. *The State,* 1 Texas Ct. App. 164 ; *Jones* v. *The State,* 3 Texas Ct. App. 150 ; *Halbert* v. *The State,* 3 Texas Ct. App. 659 ; *Hill* v. *The Commonwealth,* 2 Gratt. 603 ; *The People* v. *Tinder,* 19 Cal. 541 ; *Ex parte Taylor,* 39 ; *Ex parte McAnally,* 53 Ala. 496.

WHITE, J.   Appellant was indicted in the District Court of Travis County, jointly with one Gentry Bailey, for the murder of one Gus Porter.   The murder is alleged to have been committed on November 15, 1878.   On November 21, 1878, the indictment was found and returned into court. District Court being in session, McKinney applied for and obtained from the Hon. E. B. Turner, judge presiding, a writ of *habeas corpus,* for the purpose of obtaining bail. His application was heard in open court, on December 26, 1878, and bail was refused.   From that judgment he appeals to this court.

We have examined the record presented here, with great care, and have had, to aid us in our investigations, the very able briefs and oral arguments of counsel, and yet we are

·constrained to say that, in our opinion, no error is perceived in the action of the court below in refusing bail to the applicant. Following the uniform practice in such cases, we forbear comment upon the facts.

The judgment of the District Court of Travis County is affirmed, and it is further ordered that the appellant pay all the costs of this proceeding.

*Ordered accordingly.*